UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
In re:

THE GREAT ATLANTIC & PACIFIC TEA                    **OPINION AND ORDER**
COMPANY, INC., *et al.*,

                                        Debtors.
-----------------------------------------------------------------------x
GROCERY HAULERS, INC.,

                                        Appellant,

              - against -

THE GREAT ATLANTIC & PACIFIC TEA                    11-CV-3558 (CS)
COMPANY, INC., *et al.*,

                                        Appellees.
-----------------------------------------------------------------------x

<u>Appearances</u>:

William R. Fried
Stephen B. Selbst
Joshua J. Angel
Kerry K. Jardine
Herrick, Feinstein LLP
New York, New York
*Counsel for Appellant Grocery Haulers, Inc.*

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
Andrew M. Genser
Kirkland & Ellis LLP
New York, New York

James J. Mazza, Jr.
Kirkland & Ellis LLP
Chicago, Illinois
*Counsel for Appellees The Great Atlantic & Pacific Tea Company, Inc., et al.*

Seibel, J.

Before the Court is the appeal of Grocery Haulers, Inc. ("GHI" or "Appellant") from the Bankruptcy Court's Order ("Final Order")[1] denying GHI's motion seeking a ruling that the automatic stay does not bar litigation that GHI sought to bring in New Jersey district court against the Debtors or, in the alternative, that good cause existed to grant relief from the automatic stay.  For the reasons stated below, the Bankruptcy Court's Final Order is AFFIRMED.

## I.      BACKGROUND

Appellant first gained a role in the grocery store operations of The Great Atlantic & Pacific Tea Company, Inc. ("A&P") and certain of its affiliates (collectively "Appellees" or "Debtors") when A&P acquired Pathmark Stores, Inc. ("Pathmark") in 2007.  (*See* Bankr. Doc. 671 Ex. 1 ¶ 4.)[2]  From 1997 until the acquisition in 2007, Appellant provided all trucking services to Pathmark-bannered supermarkets through a contract with Pathmark dated September 15, 1997 (the "Trucking Agreement").  (*See* Bankr. Doc. 660 ¶¶ 7–8; Bankr. Doc. 660 Ex. 1 ¶ 7; Bankr. Doc. 671 Ex. 1 ¶ 4.)  Pathmark had previously run its own trucking operations, but under the Trucking Agreement, for nominal consideration, it transferred the equipment and trucking business to Appellant, retaining control over wages and other terms of employment of Appellant's employees who serviced Pathmark stores.  (*See* Bankr. Doc. 660 ¶ 7; Bankr. Doc. 1163 ¶¶ 9–15.)  Concurrent with the Trucking Agreement, Pathmark also entered into an agreement with C&S Wholesale Grocers, Inc. ("C&S"), whereby C&S agreed to handle the

---

[1] "Final Order" refers to the Bankruptcy Court's Order Denying Grocery Haulers, Inc.'s Motion for a Determination that the Automatic Stay Does Not Bar Commencement of Certain Litigation Against the Debtors for Post-Petition Conduct or, in the Alternative, Granting Relief from the Automatic Stay to Permit Commencement of Such Litigation.  (Doc. 1 Ex. 1.)

[2] "Bankr. Doc." refers to documents filed in the Bankruptcy Court for the Southern District of New York under docket number 10-B-24549.

2

majority of Pathmark's merchandise procurement and to manage Pathmark's supply chain.  (*See* Bankr. Doc. 660 ¶ 15; Bankr. Doc. 671 Ex. 1 ¶ 3.)

At the time that A&P acquired Pathmark, A&P had its own separate supply and logistics contract with C&S, so A&P and C&S entered into a new agreement to integrate the two contracts.  (*See* Bankr. Doc. 660 ¶ 15; Bankr. Doc. 671 Ex. 1 ¶¶ 3, 5.)  The new agreement, however, left the legacy Trucking Agreement between Pathmark and Appellant in place.  (Bankr. Doc. 671 Ex. 1 ¶ 5.)  Separately, C&S had its own trucking contract with Appellant (the "C&S Contract"), pursuant to which Appellant delivered merchandise to other of C&S's non-Pathmark customers, including A&P.  (*Id.*)  C&S's warehouse facilities located near Woodbridge, New Jersey (the "Woodbridge Facilities") were an integral part of Appellees' supply base, and held the bulk of merchandise that C&S procured and GHI transported for Pathmark-branded stores.  (*See* Bankr. Doc. 660 ¶¶ 15, 17; Bankr. Doc. 660 Ex. 1 ¶ 7; Bankr. Doc. 671 Ex. 1 ¶¶ 2, 5.)

Appellees commenced their bankruptcy case on December 12, 2010 by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  (Bankr. Doc. 1.)  After analyzing their finances at that time, Appellees felt that they were burdened by high costs.  (*See* Bankr. Doc. 671 ¶¶ 1–2; Bankr. Doc. 671 Ex. 1 ¶¶ 7–9.)  Specifically, Appellees maintained that they were paying substantially more for services under the Trucking Agreement than they could negotiate with other vendors in the marketplace, because it was a "cost-plus" contract under which Appellees were covering both operational and administrative costs.  (*See* Bankr. Doc. 671 Ex. 1 ¶¶ 6–9.)  Additionally, in early 2011, C&S publicly announced its intention of closing the Woodbridge Facilities as of February 6, 2011, which would have required the supply and distribution volume previously handled for Appellees there to be moved hundreds of miles from the bulk of Appellees' stores, further increasing costs under the Trucking Agreement.  (*See*

Bankr. Doc. 660 ¶¶ 17–18; Bankr. Doc. 671 Ex. 1 ¶ 8.)  As a result, Appellees conducted a bidding process, which included Appellant, C&S, and a few other vendors, for a contract to take over the services previously covered under the Trucking Agreement.  (*See* Bankr. Doc. 660 ¶¶ 20–22; Bankr. Doc. 671 Ex. 1 ¶¶ 9–10.)  At the same time, in the alternative, Appellees attempted—without success—to negotiate with Appellant for changes to the Trucking Agreement.  (*See* Bankr. Doc. 660 ¶ 19.)  Ultimately, C&S submitted a proposal to Appellees that was less expensive and more favorable than Appellant's best bid, especially because it included the transportation services that Appellant had previously provided under the C&S Contract.  (*See* Bankr. Doc. 671 Ex. 1 ¶¶ 10–15.)

On January 18, 2011, Appellees moved pursuant to Section 365 of the Bankruptcy Code to reject the Trucking Agreement (the "Rejection Motion").  (*See* Bankr. Doc. 545.)  Appellant objected to the Rejection Motion on January 28, 2011, and argued that if the Trucking Agreement was terminated, Appellant would be forced to lay off hundreds of employees without being able to provide proper sixty-day notice under the federal Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101–2109, and the Millville Dallas Airmotive Plant Job Loss Notification Act, N.J. Stat. Ann. §§ 34:21-1–21-7, (collectively "WARN Acts").  (*See* Bankr. Doc. 660.)  On February 2, 2011, the Bankruptcy Court heard oral argument on the Rejection Motion from Appellant, Appellees, Appellees' Official Committee of Unsecured Creditors, C&S, and Local 863 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 863"), the union that represents some of Appellant's employees.  (*See* Bankr. Doc. 988 at 83:24–129:16.)  The Bankruptcy Court granted the Rejection Motion and stated its reasons on the record.  (*See id.* 124:25–129:4.)

On February 3, 2011, prior to the Bankruptcy Court's entry of its order on the Rejection Motion (the "Rejection Order"), GHI filed a notice of appeal and emergency motion to stay the entry of the Rejection Order (the "Emergency Stay Motion").  (*See* Bankr. Doc. 714.)  At a telephonic hearing held on February 4, 2011, the Bankruptcy Court denied the Emergency Stay Motion, (*see* Bankr. Doc. 989 at 33:18–45:9), and on the same day entered the Rejection Order, (*see* Bankr. Doc. 721), authorizing Appellees to reject the Trucking Agreement, after finding that rejection was within Appellees' sound business judgment and in their best interest, (*see id.* at 2; Bankr. Doc. 988 at 125:18–129:4).

On February 6, 2011, the rejection of the Trucking Agreement became effective, Appellees commenced their replacement transportation arrangement with C&S, and C&S terminated a portion of the C&S Contract under which Appellant delivered perishable foods to A&P and Waldbaum's stores operated by Appellees.  (*See* Bankr. Doc. 1387 ¶ 11.)  As a result of the Rejection Order, Appellant was forced to lay off more than 220 hourly and salaried employees, including employees represented by Local 863, without providing sixty-day notice of termination of the Trucking Agreement to those employees as required by the WARN Acts.[3] (Bankr. Doc. 1163 ¶ 1; *see* Bankr. Doc. 660 Ex. 1 ¶ 18; Bankr. Doc. 660 Ex. 2 ¶ 6.)

On or about March 21, 2011, Local 863 commenced litigation against Appellant in the United States District Court for the District of New Jersey (the "New Jersey Action") alleging that, among other things, Appellant was liable for violations of the WARN Acts and for severance pay under certain collective bargaining agreements.  (*See* Bankr. Doc. 1163 Ex. A.)  In turn, on March 31, 2011, Appellant filed a motion (the "Relief Motion") in the Bankruptcy Court requesting a determination that the automatic stay did not apply to certain claims that it sought to

---

[3] The WARN Act contains exceptions, including one allowing mass layoffs without sixty-day notice if the layoff "is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  29 U.S.C. § 2102(b)(2)(A).

assert against A&P through a third-party complaint in the New Jersey Action or, in the alternative, relief from the automatic stay so that it could file the third-party complaint. (*See* Bankr. Doc. 1163.)  The causes of action that GHI sought to assert against A&P included a claim that A&P was responsible for the WARN Acts violations as "controlling employer," a tortious interference claim, and other claims that Appellant does not discuss on appeal. (*See* Proposed Third-Party Compl. 26–41.)[4]

The Bankruptcy Court heard argument regarding Appellant's Relief Motion on April 28, 2011. (*See* Hr'g Tr.)[5]  The court ruled on the record that the automatic stay did apply because Appellant's claims against Appellees related to the rejection of the Trucking Agreement, and therefore, under 11 U.S.C. § 365, are considered to flow from pre-petition conduct protected by the automatic stay. (*See id.* 158:21–160:10.)  The court further stated that under the factors identified by the Second Circuit in *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990), there was no basis for relief from the automatic stay to permit Appellant to file the proposed third-party complaint against Appellees in the New Jersey Action. (*See* Hr'g Tr. 160:11–162:24.)  On May 2, 2011, the Bankruptcy Court entered its Final Order denying Appellant's Relief Motion. (*See* Final Order.)

## II.   DISCUSSION

### A.   <u>Standard of Review</u>

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . .

---

[4] "Proposed Third-Party Compl." refers to Appellant's proposed Answer and Third-Party Complaint, attached as an exhibit to Appellant's Relief Motion. (Bankr. Doc. 1163 Ex. B.)
[5] "Hr'g Tr." refers to the transcript of the April 28, 2011 hearing held by Judge Drain relating to the Relief Motion. (Appellant's App., (Doc. 7 Ex. 1), 218–48.)

[and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges."  28 U.S.C. § 158(a).  A district court reviews a bankruptcy court's findings of fact for clear error and reviews its legal conclusions *de novo*.  *Overbaugh v. Household Bank, N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009); *see* Fed. R. Bankr. P. 8013 (district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").  A bankruptcy court's equitable discretion—such as its determination on a motion to lift the automatic stay—is reviewed for abuse of discretion.  *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 91 (2d Cir. 2003).  "An abuse of discretion may consist of an error of law or a clearly erroneous finding of fact, or a decision that, though not necessarily the product of a legal error or a clearly erroneous factual finding[,] cannot be located within the range of permissible decisions."  *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 145 (2d Cir. 2009) (alteration in original) (citations and internal quotation marks omitted).

    **B.**    **Application of the Automatic Stay**

        **1.**    **Legal Standards**

Under Section 365 of the Bankruptcy Code, subject to the bankruptcy court's approval, a debtor has the option to assume or reject any executory contract—that is, a contract requiring further performance from each party—any time after the commencement of a bankruptcy case and before the confirmation of the plan of reorganization.  *See* 11 U.S.C. § 365(a), (d)(2).  The rejection of an executory contract in bankruptcy "constitutes a breach of such contract . . . immediately before the date of the filing of the petition."  *Id.* § 365(g)(1).  Courts have characterized Section 365(g) as a "legal fiction," but indulge the fiction because executory

contracts are entered into pre-petition and thus impose pre-petition obligations on both parties. *See In re Mace Levin Assocs., Inc.*, 103 B.R. 141, 144 (Bankr. N.D. Ohio 1989); *see also In re Old Carco LLC*, 424 B.R. 633, 639–40 (Bankr. S.D.N.Y. 2010) ("[E]ncumbering a debtor with a post-petition obligation would seriously undercut the entire purpose of the rejection process. Requiring administrative priority for obligations that were first undertaken pre-petition is exactly what the rejection provisions are supposed to avoid.") (citation and internal quotation marks omitted). The purpose of Section 365 is to enable a debtor to relieve itself of burdensome obligations that may impede successful reorganization or be detrimental to the debtor's other creditors. *In re Old Carco LLC*, 424 B.R. at 639.

Under Section 362 of the Bankruptcy Code, the filing of a bankruptcy petition operates as a stay against, among other things, "the commencement . . . of a judicial . . . proceeding against the debtor that . . . could have been commenced before the commencement of the case." 11 U.S.C. § 362(a)(1). The automatic stay provides a debtor with breathing room from the claims of its creditors, and "allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir. 1990). "The scope of the automatic stay is broad and is a fundamental debtor protection that not only protects debtors but protects creditors as well." *Enron Corp. v. Cal. ex rel. Bill Lockyer (In re Enron Corp.)*, 314 B.R. 524, 533–34 (S.D.N.Y. 2004) (citations omitted). Because, as stated above, a rejected executory contract is deemed breached immediately before the filing of the bankruptcy petition, it follows that, because of Section 362, damages claims that flow from the rejection of an executory contract are stayed by the automatic stay. *See* 11 U.S.C. §§ 362(a)(1), 365(g)(1); *First*

*Fiscal Fund Corp. v. Fishers Big Wheel, Inc.*, 36 B.R. 299, 302 (Bankr. E.D.N.Y. 1984); *see also In re Old Carco LLC*, 424 B.R. at 639 (breach of executory contract treated as pre-petition claim that is afforded general unsecured status).

### 2.    WARN Acts and Tortious Interference Claims

On appeal, Appellant argues that the Bankruptcy Court erred in finding that (1) the WARN Acts and tortious interference claims arose pre-petition and (2) Appellant's proposed third-party claim seeking declaratory judgment that A&P is the controlling employer of Appellant's employees was a common law contribution claim that the Bankruptcy Court—not the New Jersey district court—should adjudicate.  (*See* Appellant's Br., (Doc. 7), 11–12; Appellant's Reply Br., (Doc. 10), 3–6.)  Appellees argue that the Bankruptcy Court properly held that the claims in Appellant's proposed third-party complaint were essentially rejection damages claims that arose out of the parties' pre-petition relationship and are inseparable from the rejection of the Trucking Agreement.  (*See* Appellees' Br., (Doc. 8), 10–14.)

### a.    Timing of Claims

Appellant has not persuaded this Court that its claims relating to the WARN Acts violations or tortious interference with contract are post-petition claims to which the automatic stay does not apply.  First, regarding the WARN Acts claims, absent the rejection of the contract here, Appellant would not have had to lay off its employees, or, at the very least, would have been able to comply with the WARN Acts' notification requirements.  Appellant's damages— liability to the members of Local 863 for WARN Acts violations—are thus predicated on the rejection of the contract, which is treated under the Code as arising immediately before the petition date, even though the actual act of rejection occurred post-petition, s*ee Fed. Realty Inv. Trust v. Park (In re Park)*, 275 B.R. 253, 256 (Bankr. E.D. Va. 2002) ("Even though the act of

rejection takes place after the date of the bankruptcy filing, the breach (with certain exceptions) is treated as occurring on the date of the bankruptcy filing."), and are stayed by the automatic stay.

Appellant has not cited a case relating to a debtor's rejection of an executory contract—and the Court is aware of none—that holds that statutory and tort liability for damages flowing from a rejected executory contract may be treated as arising post-petition.[6]  Moreover, Appellant's reliance on *Eric Bram & Co. v. Blair Realty, Ltd.*, No. 92-CV-2609, 1992 WL 281022 (D.N.J. Oct. 5, 1992), is misplaced.  In *Bram*, after the bankruptcy petition was filed, the bankruptcy court approved a lease/sale of realty owned by the debtor.  *Id.* at *1.  A party sued for commissions due to it from a third party for the lease/sale of the property and alleged that the debtor tortiously interfered with a contract it had with that same third party.  *Id.*  The District of New Jersey held that because the lease/sale of the property—which was unrelated to any bankruptcy matter—occurred after debtor's bankruptcy petition was filed, the post-petition tort claims related to it could not have been brought pre-petition.  *Id.* at *4.  As Judge Drain found, however, the same theory does not hold here because the post-petition conduct was the rejection of the contract, which did happen in bankruptcy and by legal fiction is treated as having occurred pre-petition.  *See* Hr'g Tr. 159:8–160:10; *In re Park*, 275 B.R. at 256.  Accordingly, the Bankruptcy Court did not err in finding that the claims regarding the WARN Acts violations arose pre-petition and are stayed under Section 362.

---

[6] The cases that Appellant cites are distinguishable because none involved pre-petition executory contracts or claims that arose pre-petition.  *See Aracich v. Wheeling-Pittsburgh Steel Corp.*, 961 F.2d 1576 (6th Cir. 1992) (claim brought by employee discharged for cause three years after petition filed); *Bellini Imports, Ltd. v. Mason & Dixon Lines, Inc.*, 944 F.2d 199 (4th Cir. 1991) (bankrupt company entered into new agreement post-petition and lawsuit regarded post-petition breach of contract); *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992 (5th Cir. 1985) (claim regarding insurance coverage for fire intentionally set at debtor's facility post-petition by debtor's principal stockholder); *Larami Ltd. v. Yes! Entm't Corp.*, 244 B.R. 56 (D.N.J. 2000) (patent issued post-petition and claim premised on infringement of patent); *Cont'l Air Lines, Inc. v. Hillblom (In re Cont'l Air Lines, Inc.)*, 61 B.R. 758 (S.D. Tex. 1986) (claims regarding post-petition attempted takeover by debtor of another airline).

Second, Appellant's tortious interference claim is intimately tied to its claim that Appellees are liable for the WARN Acts violations.[7]  Indeed, even by Appellant's own account, "[w]hile GHI does not dispute that some of the actions of the Debtors and C&S, which resulted in this claim, may have occurred pre-petition, the tortious actions of the Debtors did not ripen into a claim into [*sic*] post-petition, *when the Debtors first rejected the Trucking Agreement*." (Appellant's Br. 16) (emphasis added).  As that ripening is, by legal fiction, regarded as having occurred pre-petition, this claim, too, is protected by the automatic stay.  Further, to the extent any facts are set forth in the proposed third-party complaint in connection with the tortious interference claim—which strikes this Court as totally conclusory,[8] *see Kahn v. Rusckowski*, 2010 WL 2696856, at *5 (N.J. Super. Ct. App. Div. July 1, 2010) (per curiam) ("[T]he complaint must state the facts on which the claim is based rather than relying on conclusory allegations or the assertion that essential facts that the court may find lacking can be dredged up in discovery.") (internal citation and quotation marks omitted)—they are facts relating to Appellees' preparation for and actual rejection of the Trucking Agreement, (*see* Proposed Third-Party Compl. ¶¶ 57, 58, 76, 85–86), which must be regarded as having occurred pre-petition.  Moreover, this Court agrees with Judge Drain's observation that, if consequences flowing from rejection of contracts could be the subject of claims outside of the Bankruptcy Court, it would "have the distinct prospect of chilling the debtors' ability under the statute to reject contracts."  (Hr'g Tr. 147:6–8.)

---

[7] Were the tortious interference claim not intimately related to the WARN Acts claims, it would not be the proper subject of a third-party complaint under New Jersey law.  *See* N.J. R. 4:8-1(a) (Defendant's third-party complaint may include "any claim which defendant has against the third-party defendant involving a common question of law or fact arising out of the same transaction or series of transactions as the plaintiff's claim"); *Horner Mack Trucks, Inc. v. Crescar Corp.*, 359 A.2d 519, 521 (N.J. Super. Ct. Law Div. 1976) ("Entirely separate and independent claims cannot be entered against the third-party even though they may arise out of the same general set of facts as the main claim or be in some way derivative of the outcome of the main claim.").

[8] The third-party complaint does not present facts suggesting that A&P was behind the closure of the Woodbridge Facilities or that C&S's termination of its contract with GHI was a result of anything more than the fact that there was no work for GHI to do once those facilities were closed.  It accuses A&P of "engineering," (Proposed Third-Party Compl. ¶ 50), "sanction[ing]," (*id.* ¶ 57), and "intentionally procur[ing]," (*id.* ¶ 202), C&S's termination of the C&S Contract, but provides no facts underlying this conclusion.

On review of the record, I do not find any legal or clear factual error in the conclusion that Appellant's claims arose pre-petition under Section 365(g) because they flowed directly from Appellees' rejection of the Trucking Agreement, and are thus stayed by the automatic stay. I understand Appellant's frustration that it is prevented by the automatic stay from bringing a suit it could not have brought pre-petition, but that occurs whenever a party seeks damages from the rejection of a contract.  Appellant will have to settle for the remedies available to it in the Bankruptcy Court.

### b.    <u>Type of Claim</u>

Next, Appellant argues that the Bankruptcy Court erred in finding that Appellant's claim against A&P was for contribution, rather than a claim based on primary liability as a "controlling employer" or "joint employer" within the meaning of the WARN Acts.  (*See* Appellant's Br. 11–12.)  Appellees argue that the Bankruptcy Court properly characterized the claims as seeking contribution because Local 863 or a unit of local government are the only entities that can assert a claim of primary liability under the WARN Acts, and Local 863 here asserted claims solely against Appellant.  (*See* Appellees' Br. 14.)

It is unclear what legal significance Appellant attributes to the classification of its claim as one for primary liability rather than contribution.  Because, however, Appellant's claim only came into being because Appellant seeks to hold A&P liable on an affiliated corporate liability theory, Judge Drain did not err in determining that the claim was for contribution and that it should be determined in the Bankruptcy Court.

Under the WARN Acts, an employer with 100 or more employees must, sixty days in advance of a plant closing or mass layoff, provide written notice to each affected employee or their representative, as well as the state.  *See* 29 U.S.C. § 2102(a); N.J. Stat. Ann. § 34:21-2(a).

Failure to comply with the notice provisions exposes the employer to liability for back pay and benefits for the period of the violation, up to a maximum of sixty days. *See* 29 U.S.C. § 2104(a); *see also* N.J. Stat. Ann. § 34:21-2(b) (employer to pay severance equal to one week of pay for each full year of employment, but WARN Act back pay shall be credited to meeting such requirement).

The WARN Act does not address affiliated corporate liability, such as joint or controlling employer liability, but courts have employed the Department of Labor ("DOL") regulations issued under the WARN Act to determine such liability. *See* 20 C.F.R. § 639.3(a)(2) (setting forth five-factor DOL test); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 490–91 (3d Cir. 2001) (employing DOL test); *see also Austen v. Catterton Partners V, LP*, 709 F. Supp. 2d 168, 173–74 (D. Conn. 2010) (noting that Second Circuit has not decided whether parent company may be held liable under WARN Act for subsidiaries' actions, but noting trend among circuits to follow—and subsequently applying—DOL test). Courts applying the DOL test, even in the context of adversary proceedings in bankruptcy, have been able to determine the limited question of whether a company is jointly liable for WARN Act violations under the DOL test. *See D'Amico v. Tweeter Opco, LLC (In re Tweeter Opco, LLC)*, 453 B.R. 534 (Bankr. D. Del. 2011) (bankruptcy court analyzing and granting employees' motion for summary judgment on issue of whether debtor and another entity were single employer within meaning of WARN Act); *Manning v. DHP Holdings II Corp. (In re DHP Holdings II Corp.)*, 447 B.R. 418, 422–25 (Bankr. D. Del. 2010) (bankruptcy court analyzing issue of whether debtor and other party "may be considered a 'single employer' (and therefore jointly liable) for WARN Act violations"); *see also In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 244–45 (3d Cir. 2008) (reflecting on "the policy considerations that animate the WARN Act" in finding that under single employer

13

liability for WARN Act violations "it can be determined that two entities should be considered jointly liable for the closing and the subsequent lack of notice" and looking to the DOL five-factor test).

In *Law v. American Capital Strategies, Ltd.*, No. 05-CV-0836, 2007 WL 221671 (M.D. Tenn. Jan. 26, 2007), the Middle District of Tennessee addressed the question of whether Service Transport, a defunct company liquidating under the protection of the bankruptcy court, was an indispensable party under Federal Rule of Civil Procedure 19[9] in a district court case determining the WARN Act liability of American Capital, a company that had infused large sums of money into Service Transport in the years leading up to the bankruptcy filing.  *Id.* at *18.  The court granted the plaintiff-employees' motion for summary judgment on American Capital's affirmative defense that plaintiffs had failed to join Service Transport as an indispensable party. *Id.*  The court stated, among other things, that the allegations in the case suggested that Service Transport was a joint tortfeasor or co-conspirator in the alleged failure to comply with the WARN Act, and that Rule 19(a) does not require joinder if the absent party may later be held responsible for contribution or indemnification.  *Id.*

While the facts of *American Capital Strategies* differ somewhat from those here, the reasoning of that case suggests that A&P's potential liability need not be litigated in the New Jersey Action.  Guided by the logic in that decision, as well as the other authority cited above, this Court finds that the Bankruptcy Court did not err in finding that Appellant's claim against Appellees—although premised on joint or controlling employer liability under the WARN Acts—would be a contribution claim that could and ought to be adjudicated in the Bankruptcy

---

[9] Federal Rule of Civil Procedure 19 governs the joinder of persons necessary for a suit's just adjudication.  *See* Fed. R. Civ. P. 19.  Under Rule 19, a court must dismiss an action where a party was not joined only if:  (1) an absent party is required, (2) it is not feasible to join the absent party, and (3) it is determined "in equity and good conscience" that the action should not proceed among the existing parties.  *Republic of Phil. v. Pimentel*, 553 U.S. 851, 862–63 (2008).

Court.  GHI potentially having to pay Local 863 for WARN Acts violations is, as Judge Drain

found, a consequence of A&P's rejection/breach of the Trucking Agreement, (*see* Hr'g Tr.

159:10–160:10), and he did not err in concluding that the litigation over the extent to which A&P

should be held responsible—in other words, litigation regarding consequential damages from

that rejection/breach—should take place in the Bankruptcy Court.  Further, Appellant can hardly

fault Judge Drain for characterizing its claim against Appellees as one for contribution, when its

own counsel did so multiple times in arguing that the stay should not apply or should be lifted.

(*See id.* 138:14–16, 139:24–140:2, 141:21–22, 143:22–24.)

### C.     Relief from the Automatic Stay

Even in situations where, as here, the automatic stay does apply, a bankruptcy court has

the discretion under Section 362(d)(1) to grant relief from the automatic stay "for cause," by

"terminating, annulling, modifying, or conditioning" the stay.  11 U.S.C. § 362(d)(1).  The

movant must make an initial showing of cause, and then the burden shifts to the party opposing

the motion to prove that it is entitled to the continued protections of the automatic stay.  *See id.* §

362(g); *Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002); *In re*

*Cicale*, No. 05-CV-14462, 2007 WL 1893301, at *3 (Bankr. S.D.N.Y. June 29, 2007).  Courts

regularly employ the Second Circuit's twelve-factor test, commonly referred to as the "*Sonnax*

factors,*" to determine whether the movant has made the requisite initial showing of cause.  *See*

*In re Sonnax Indus.*, 907 F.2d at 1286.  To the extent the factors apply, courts can consider:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable

subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*Id.* "The Bankruptcy Court's decision [regarding automatic stay relief] should not be disturbed on appeal where the record shows that court considered the appropriate factors for determining whether cause for relief from the stay exists." *Grayson v. Worldcom, Inc. (In re Worldcom, Inc.)*, No. 05-CV-5704, 2006 WL 2255071, at *2 (S.D.N.Y. Aug. 4, 2006); *accord Case v. United States (In re Case)*, 384 F. App'x 43, 44 (2d Cir. 2010).

Appellant argues that relief from the automatic stay was appropriate because it faces the risk of inconsistent judgments regarding who is Local 863's employer for purposes of the WARN Acts violations. (*See* Appellant's Br. 18–20; Appellant's Reply Br. 6.) Appellant claims that if A&P is not a party to the New Jersey Action, it will have to litigate A&P's status as employer there, and then commence an adversary proceeding in the Bankruptcy Court where it will have to litigate that issue anew. (Appellant's Br. 19–20.) Furthermore, it argues it will be prejudiced in the New Jersey Action because it will have to treat A&P as a non-party, thus complicating Appellant's discovery of documents and testimony. (*Id.* 20.) Appellant additionally states that, under *Sonnax* factors 1, 4, 7, 9, and 10, respectively, the New Jersey district court could resolve all the WARN Acts and tortious interference claims in a single action; the New Jersey district court has expertise to hear the litigation; other creditors will not be prejudiced because Appellant cannot enforce a money judgment without the Bankruptcy Court's approval; the successful prosecution of claims against Appellees will not result in an avoidable judicial lien; and judicial economy is promoted by centralizing all of the claims in the proposed third-party complaint in one forum. (*See* Appellant's Br. 21–22.)

16

Appellees argue that the New Jersey Action is exclusively a dispute between Appellant and Local 863.  (Appellees' Br. 19.)  Moreover, under *Sonnax* factors 1, 2, 10, 11, and 12, respectively, according to Appellees, the Bankruptcy Court is in a better position to handle Appellant's claims because it can also decide the priority of such claims and permit Appellant to collect on those amounts; there is plainly a close connection between the New Jersey Action and Appellees' bankruptcy case; judicial economy weighs in favor of adjudicating claims in the context of the chapter 11 case because the claims are for rejection damages; the parties are nowhere near ready for trial in the New Jersey Action; and the balance of harms favors Appellees because, among other things, the New Jersey district court does not need to reach the issue of whether Appellees are a joint or controlling employer of Appellant in the New Jersey Action, and thus the Bankruptcy Court would be the only court to make a determination on that issue.  (*See id.* 17–21.)

At the April 28 hearing, Judge Drain closely analyzed the relevant *Sonnax* factors in determining that the stay should not be lifted.  He noted the "distinct connection" between the claims in the proposed third-party complaint and Appellees' bankruptcy case; found that while both courts were capable of handling WARN Acts litigation, the Bankruptcy Court—not the New Jersey district court—had "distinct expertise" to evaluate the nature and priority of Appellant's claims; determined that other of Appellees' creditors could be prejudiced by having the issues litigated in the New Jersey Action; noted that the parties were not ready for trial in the New Jersey Action; and held that judicial economy would not be served by litigating the proposed third-party complaint in the New Jersey Action because the issue before the New Jersey district court is whether Appellant is liable to its employees for failing to give notice under the WARN Acts, whereas the issue in the proposed third-party complaint is whether

Appellees are liable to Appellant on a contribution theory because of their status as joint or controlling employer.  (*See* Hr'g Tr. 160:11–162:24.)

Judge Drain did not abuse his discretion in determining not to lift the automatic stay.  As discussed above, Appellant's claims against Appellees relate to pre-petition conduct under Section 365, which provides a close connection between Appellant's claim and Appellees' chapter 11 case.  Absent the filing of the proposed third-party complaint, the issue before the New Jersey district court will be Appellant's liability to Local 863 under the WARN Acts.[10]  The issue of whether Appellees are liable for all or part of any damages awarded need not be decided by the New Jersey district court.  If Appellant is found liable in the New Jersey Action, it can file an adversary proceeding in the Bankruptcy Court to relieve itself of liability—either completely or in part—upon a showing to the Bankruptcy Court that Appellees are liable on some affiliated corporate liability theory.  Finally, in balancing the harms, this Court finds, for the reasons stated above, that Appellant will not face a risk of inconsistent judgments if the proposed third-party complaint is not filed.  Rather, if Appellees are brought into a different forum to defend against the proposed third-party complaint, Appellees face a monetary strain that could impact their creditors as well as Appellees' successful reorganization.

Finally, I am not persuaded by Appellant's argument that the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011)—which held that a bankruptcy court "lack[s] the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved

---

[10] This case differs factually from *In re Coachworks Holdings, Inc.*, 418 B.R. 490 (Bankr. M.D. Ga. 2009), on which Appellant relies.  In *Coachworks*, which in any event is not binding on this Court, a former employee of the debtor filed a complaint in district court against the debtor and debtor's parent company as "joint employers" based on his pre-petition termination from his job, which the employee alleged occurred because his health condition was costing his employers a significant amount of money.  *Id.* at 491–92.  The court granted stay relief because "the existence of pending litigation *against the debtor* in a nonbankruptcy forum" created a risk of inconsistent judgments.  *Id.* at 492 (emphasis added).  In other words, absent relief from the stay, the plaintiff-employee would be litigating identical issues in two different forums—against the debtor in bankruptcy court and against the debtor's parent in district court.  Here, Local 863 did not sue Appellees, Local 863's claims against GHI will be litigated only in New Jersey, and GHI's claims against A&P will be litigated only in the Bankruptcy Court.

in the process of ruling on a creditor's proof of claim," *id.* at 2620[11]—means that the Bankruptcy Court lacks the authority to enter final judgment on the claims.  A bankruptcy court has constitutional authority over "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11."  28 U.S.C. § 157(b)(1); *see Stern*, 131 S. Ct. at 2618 (bankruptcy court has constitutional authority over claims when "the action at issue stems from the bankruptcy itself").  "'Core' proceedings are those that directly relate to a bankruptcy court's central functions." *In re Salander O'Reilly Galleries*, 453 B.R. at 114; *see* 28 U.S.C. § 157(b)(2) (providing non-exhaustive list of core proceedings).  "Matters that '*arise in*' a case under the Bankruptcy Code are those based on a right created by the Bankruptcy Code and that, by their nature, can only be brought in a case under the Bankruptcy Code."  *In re Salander O'Reilly Galleries*, 453 B.R. at 114 (emphasis in original) (internal quotation marks omitted).  Conversely, "[m]atters that are only '*related to*' the bankruptcy do not have their roots in the Bankruptcy Code, and would be brought in an alternative forum were the debtor not before the bankruptcy court."  *Id.* (emphasis in original) (internal quotation marks omitted).

Although I need not decide the issue definitively, I am inclined to conclude that the proposed third-party claims would be core or at least claims that arose in the bankruptcy case, and the Bankruptcy Court would have the ability to enter final judgment.  In any event, it is not so clear that the Bankruptcy Court could *not* enter final judgment that Judge Drain's conclusions

---

[11] The Supreme Court's admonition at the end of its opinion—"[w]e do not think the removal of counterclaims such as [petitioner's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree . . . that the question presented here is a 'narrow' one," *id.*—has led some courts interpreting *Stern* to limit the import of the holding.  *See, e.g.*, *In re Salander O'Reilly Galleries*, 453 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) ("Nowhere in . . . *Stern* does the Supreme Court rule that the bankruptcy court may not rule with respect to state law when determining a proof of claim in the bankruptcy, or when deciding a matter directly and conclusively related to the bankruptcy. . . . *Stern* repeatedly emphasizes that it addresses only the constitutionality of the bankruptcy court making a final ruling on a state-law counterclaim that would not be finally resolved in the process of allowing or disallowing a proof of claim."); *Tibble v. Wells Fargo Bank, N.A. (In re Hudson)*, 455 B.R. 648, 657 (Bankr. W.D. Mich. 2011) (finding that bankruptcy court could render final judgment even though it was reviewing state law issues when proceeding "arises under" Bankruptcy Code).

are an abuse of discretion.   First, Appellant's claims relate to "matters concerning the administration of the estate," making them core under the Bankruptcy Code.  28 U.S.C. § 157(b)(2)(A); *see Point Blank Solutions, Inc. v. Robbins Geller Rudman & Dowd LLP (In re Point Blank Solutions, Inc.)*, 449 B.R. 446, 450 (Bankr. D. Del. 2011) (claims for declaratory relief that arise "directly from the substantive bankruptcy law right to reject executory contracts" are matters concerning administration of estate); *Republic Underwriters Ins. Co. v. DBSI Republic, LLC (In re DBSI, Inc.)*, 409 B.R. 720, 727–28 (Bankr. D. Del. 2009) (finding that rejection of leases under Section 365 "pertain[s] to the administration of the estate").  Further, rejection of "executory contracts are fundamental issues of bankruptcy law unique to the Bankruptcy Code," and thus challenges to the effects of rejection orders are core proceedings because they are claims that would not exist independent of the bankruptcy case.  *In re DBSI, Inc.*, 409 B.R. at 728; *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("[T]he authority to reject an executory contract is vital to the basic purpose to [*sic*] a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.").  Moreover, even if Appellant's proposed claims are neither related to administration of the estate nor core, they certainly "arose in" Appellees' chapter 11 case, because Appellees' right to reject executory contracts under Section 365 is "based on a right created by the Bankruptcy Code" and thus claims flowing from such a right "can only be brought in a case under the Bankruptcy Code."  *In re Salander O'Reilly Galleries*, 453 B.R. at 114.  Accordingly, the Bankruptcy Court likely has authority after *Stern* to enter final judgment on them.[12]

---

[12] Even if the Bankruptcy Court could not finally adjudicate these claims after *Stern*, this would not mean that the claims necessarily should be litigated in the first instance in the New Jersey Action.  Rather, it seems appropriate for the tribunal that has a contextual understanding of all the issues and circumstances giving rise to those claims—here, the Bankruptcy Court—to hear the claims and submit findings of fact and conclusions of law to a district court in the

For the reasons stated above, I do not find that the Bankruptcy Court abused its discretion in determining not to lift the stay. This is not to say that a reasonable jurist could not have come out the other way, but Judge Drain considered the appropriate factors and reached a conclusion within the range of permissible decisions.

## III.    CONCLUSION

For the foregoing reasons, the Final Order of the United States Bankruptcy Court, dated May 2, 2011, is hereby AFFIRMED. The Clerk of the Court is respectfully directed to docket this decision and close the case.

**SO ORDERED.**

Dated: January 27, 2012
         White Plains, New York

                                            _____
                                            CATHY SEIBEL, U.S.D.J.

---

Southern District of New York, and for that court to enter final judgment. *See Stern*, 131 S. Ct. at 2604 (where claim is only "related to" bankruptcy case, district court reviews bankruptcy court's findings of fact and conclusions of law *de novo* on any matter to which a party objects, and district court enters final judgment).